**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **v.** | **Case No. 25-CR-570 KWR** |
| **JAMES JULIAN,** | |
| **Defendant.** | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the Government requests that this Court sentence the defendant to period of incarceration within the correctly calculated advisory-guideline range of 27-33 months to be followed by three years of supervised release.

### I.    FACTUAL BACKGROUND

On February 2, 2025, Jicarilla Apache Police responded to a report of a male that had been assaulted. When they arrived at the residence, they found John Doe with a bloodied face and blood on his clothing. Doe was speaking repetitively and appeared to have injuries to his nose, eyebrow, cheeks, and teeth. Doe was taken to San Juan Regional Medical Center for treatment of his injuries. Records from that visit indicate that he suffered a nasal fracture, an orbit fracture, a 4.5 inch laceration to his nasal bridge, a 4.5 inch laceration toto his right eyebrow, and a fractured rib. The nasal fracture was identified as an "open fracture" and required 8 stitches and follow up care.

In explaining the assault, Doe advised that on February 1, 2025, he went to his cousin Nick Elote's house to drink and hangout. At some point while they were hanging out, one of Nick's

1

friends came over—it was the defendant. Doe did not know the defendant, but the three continued to drink and hang out. As it got later in the evening, Doe and Nick got into a verbal argument regarding Nick's deceased father. The defendant interjected himself by stating that he did not like the way Doe as talking to Nick. Doe responded that the conversation did not concern the defendant.

The defendant responded by attacking Doe. He repeatedly hit Doe in the face, and Doe recalled being on the floor trying to cover his face. Doe did not believe that Nick participated in the assault but did nothing to stop it. Further, Doe stated he was knocked unconscious. Eventually, the defendant stopped assaulting Doe, and Nick and the defendant left Doe alone in the room. Doe believes that they later returned after leaving the room, and the defendant assaulted him a second time. After they left for good, an unidentified woman came into the room and helped Doe.

Nick Elote was interviewed several days after the assault. Nick confirmed that he and Doe had gotten into an argument about Nick's deceased father, at which point the defendant inserted himself into the disagreement. Nick claimed to have been in the bathroom when the assault began, but he stated that he could hear the altercation between Doe and the defendant. When Nick came back from the bathroom, he saw that Doe was "beat up pretty bad." He could also see that the defendant had an injury on to the middle knuckle on his left hand. Nick claimed that he kicked the defendant out of the house after the assault.

The defendant was interviewed several days later while in custody on tribal charges. He was advised of his *Miranda* rights and agreed to waive them. During the course of the interview, the defendant admitted to assaulting Doe. He claimed that he assaulted Doe because Doe was being

mean to Nick about Nick's deceased father. The defendant claimed that Doe was getting in Nick's face, so, according to the defendant, he "just reacted" and hit Doe "first." He stated that he only hit Doe twice in the face and indicated that the blows were to Doe's eyebrow and tooth. The defendant denied hitting Doe to the point of unconsciousness but stated that after he hit Doe's tooth, "that's when he went to sleep and he chilled out." The defendant claimed that Doe let him spend the night at his house after the assault because it was late and cold out.

In the interview, the defendant had a visible injury to his left hand.   He acknowledged that the injury was sustained while assaulting Doe, specifically from punching him in the tooth.

## II.    THE CHARGES AND PLEA AGREEMENT

On March 26, 2025, the federal grand jury returned an indictment charging the defendant with assault resulting in serious bodily injury. On August 6, 2025, the defendant pled guilty to that charge. There is no plea agreement.

## III.    STATUTORY PENALTIES

The defendant now faces sentencing for that conviction. As noted by the PSR, the conviction for assault resulting in serious bodily injury exposes the defendant to up to 10 years of imprisonment, a term of supervised release of up to three years, a fine of up to $250,000.00, and a mandatory special penalty assessment of $100. PSR at ¶¶ 92, 95, and 100.

## IV.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "The Guidelines as written reflect the fact that the Sentencing Commission examined tens

of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

To that end, United States Probation has issued a PSR [Doc. 26] that sets forth the proper and correct Sentencing Guideline calculations as follows:

<u>18 U.S.C. §§ 113(a)(6): Assault Resulting in Serious Bodily Injury</u>

| | | |
|---|---|---|
| USSG. § 2A2.2 | Base Offense Level | 14 |
| USSG § 2A2.2(b)(3)(C) | Life Threatening Injury | +7 |
| U.S.S.G. § 3E1.1 | Acceptance of Responsibility | -3 |
| | **Total** | **18** |

*See* PSR at ¶¶ 25-35.

The PSR correctly calculated the defendant to be at Criminal History Category I. PSR at ¶ 42. The resulting advisory guideline range is 27 to 33 months. PSR at ¶ 93.

The United States recommends that the Court sentence the defendant to a period of incarceration within that range.

**SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)**

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of the recommended sentence.

**A.     Nature and Circumstances of the Offense**

In a senseless and alcohol-fueled burst of violence, the defendant inflicted an assault that broke three of John Doe's bones – the eye socket, nose, and a rib – and left two large lacerations to Doe's head. It took very little for the defendant to unleash this degree of violence—he simply did not like the way John Doe was talking to his cousin. The Court should rightly be troubled that the defendant would mercilessly beat a man without any detectable provocation.

As with all irrational acts of brutality, the nature and circumstances of this offense greatly weigh in favor of a sentence within the applicable guideline range.

**The History and Characteristics of the Defendant**

The defendant is no stranger to violence. In August 2024, the defendant killed a person, C.C., by hitting him with his car. The incident occurred when the defendant was at C.C.'s home to help C.C.'s girlfriend retrieve her car. C.C. came out of the home, approached the defendant's car (where the girlfriend was also sitting), and, according to the defendant, threatened them with a screwdriver. The defendant claimed that he attempted to drive away but accidentally ran into C.C. He then drove with C.C. under his car for approximately 40 feet. C.C. died as a result.

Though the defendant was not charged with any crimes in connection with this tragic death, the incident nonetheless is reflective of the defendant's propensity to engage in violent conduct

that he believes is justified under the circumstances. Given that a purportedly accidental killing of another person did not provide incentive for the defendant to change his behavior, a guideline sentence is necessary to breathe life into the § 3553 factor.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports the recommended sentence of incarceration. The defendant's criminal conduct was the epitome of disrespect for the law.

### D. The Need for the Sentence to Afford Adequate Deterrence

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving acts of extreme violence. Thus, the demands of general deterrence weigh strongly in favor of the recommended period of incarceration.

## V.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence within the correctly calculated advisory-guideline range.

Respectfully submitted,

**RYAN ELLISON**
ACTING UNITED STATES ATTORNEY


*Electronically Filed on October 29, 2025*
**Jack E. Burkhead**
Assistant United States Attorney
201 Third St. NW, Suite 900

Albuquerque, NM 87102
(505) 346-7274